UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                        CASE NO. 6:25-cr- 161- JSS-UAM

VERLYNN JAMELAH HORNE                   18 U.S.C. § 1343
                                            18 U.S.C. § 1028A
                                            18 U.S.C. § 1957
                                          26 U.S.C. § 7203

## INDICTMENT

The Grand Jury charges:

### COUNTS ONE THROUGH NINE
### (Wire Fraud)

At times material to this Indictment:

**A.  Defendant, Entities, and Lenders**

    1.    VERLYNN JAMELAH HORNE was a resident of the Middle District of Florida.

    2.    Platinum Ego, Inc. (PEI) was a Florida corporation with Articles of Incorporation filed with the State of Florida on or about April 11, 2019.  In February 2020, HORNE was the CEO of PEI and PEI was located in the Middle District of Florida.

    3.    Platinum Status Consulting Inc. (PSC) was a Florida corporation with Articles of Incorporation filed with the State of Florida on or about June 9, 2020.

PSC had no business operations in February 2020. HORNE was the CEO of PSC and PSC was located in the Middle District of Florida.

4.      Good Neighbor Tax Service Inc. (GNTS) was a Florida corporation with Articles of Incorporation filed with the State of Florida on or about September 4, 2015, that was reinstated with the State of Florida in July 2020. GNTS had no business operations in February 2020. In July 2020, HORNE was the CFO of GNTS and GNTS was located in the Middle District of Florida.

5.      Persons and entities that HORNE helped to fraudulently apply for EIDL and PPP loans in exchange for a portion of fraudulently obtained COVID-19 relief (the "COVID Fraud Clients") included the following:

| Entity | Location | Principal Person |
|---|---|---|
| Entity-1 | Orlando, Florida | Person-1 |
| Entity-2 | Orlando, Florida | Person-2 |
| Entity-3 | Orlando, Florida | Person-3 |

6.      Fifth Third Bank, a financial institution headquartered in Cincinnati, Ohio, participated in the U.S. Small Business Administration's Paycheck Protection Program ("PPP") as a lender and was authorized to lend funds to eligible borrowers under the terms of the PPP.

7.      WebBank, a financial institution headquartered in Salt Lake City, Utah, participated in the PPP as a lender and was authorized to lend funds to eligible borrowers under the terms of the PPP.

**B.    The CARES Act, the Paycheck Protection Program (PPP), and the Economic Injury Disaster Loan (EIDL) Program**

8.    The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

9.    In March 2020, the Coronavirus Aid, Relief, and Economic Security Act, or the "CARES Act," was enacted to provide immediate assistance to individuals, families, and organizations affected by the COVID-19 pandemic.  Two sources of relief provided by the CARES Act were the expansion of the Economic Injury Disaster Loan ("EIDL") program and the establishment of the Paycheck Protection Program ("PPP").

10.    The EIDL program was an SBA program that provided low-interest loans to small businesses and individuals in regions affected by declared disasters. The CARES Act authorized the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

11.    In order to obtain an EIDL loan, a qualifying business or individual had to submit an application to the SBA and provide information about its operations, including its number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in that same period. In the case of EIDLs for COVID-19 relief, that period was specified as the 12 months preceding January 31, 2020. In order to qualify for an EIDL for COVID-19 relief, a business must have operated during the 12-months preceding January 31, 2020. Businesses created on or after February 1, 2020, were not eligible for an EIDL.

12.    Using the SBA online portal, EIDL applicants submitted personal and business information in support of each EIDL application.  The application process involved filling out assorted data fields relating to the size of the affected business entity, the ownership of said business, and other information such as the number of employees and gross business revenues realized in the 12 months prior to COVID-19's impact on the national economy.  The application included a paragraph where the applicant affirmed that the information submitted was true and correct under the penalty of perjury and applicable criminal statutes.

13.    This information furnished by the applicant was then used by SBA application evaluation systems to calculate the principal amount of money the small business was eligible to receive in the form of an EIDL.  To determine whether an applicant was eligible for an EIDL, and to determine the amount of an EIDL to

award an eligible applicant, the SBA relied primarily on the self-reported information provided by the applicant concerning the operations of the small business, including the number of people employed by the business, gross revenues for the 12-month period preceding the disaster, and the cost of goods sold for that same period.

14.    EIDL proceeds were required to be used by the applicant to meet ordinary and necessary financial obligations that could not be met as a direct result of the disaster, such as payroll costs, salaries, sick leave, production costs, rent, and mortgage payments.

15.    The PPP, established by the CARES Act, was an SBA program that provided low-interest, forgivable loans to applicants to help fund qualifying businesses' payroll costs amidst the COVID-19 pandemic.

16.    In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application, which had to be signed by an authorized representative of the business. The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications.

17.    To apply for a PPP loan, a potential borrower would electronically submit an SBA Form 2483 with supporting payroll documentation to a financial institution that would administer the loan and serve as custodian of the funds. On the SBA Form 2483, an authorized representative of the business was required to certify,

among other things: (i) the applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099-MISC; (ii) current economic uncertainty made the loan request necessary to support the applicant's ongoing operations; and (iii) the PPP funds would be used to retain workers and to maintain payroll or pay other qualifying expenses.

18.    Further, when submitting the SBA Form 2483, the authorized representative certified his understanding that, should the PPP funds be knowingly used for unauthorized purposes, the United States could hold him legally liable, including for charges of fraud. The applicant was also required to certify the truth and accuracy of any information provided on the SBA Form 2483 and in all supporting documents, including any documents submitted to verify the applicant's payroll expenses. Such supporting documents could include payroll processor records, bank records, wage records, payroll tax filings with the Internal Revenue Service, or other records sufficient to demonstrate the qualifying payroll amount.

19.    Finally, the applicant was required to certify the following warning regarding false statements and other criminal penalties:

> I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. §§ 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. § 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. § 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

6

20.     A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

21.     In order to apply for an EIDL or PPP loan, an applicant had to provide a taxpayer identification number for the business, specifically, either an employer identification number ("EIN") (for businesses with employees), or a social security number ("SSN") (for sole proprietorships or independent contractors).

22.     The CARES Act benefits described above, including EIDL and PPP loans, were benefits that were authorized, transported, transmitted, transferred, disbursed, and paid in connection with a presidentially declared major disaster and emergency.

## C.     The Scheme and Artifice

23.     Beginning at least as early as May 2, 2020, and continuing through at least April 22, 2021, in the Middle District of Florida and elsewhere, the defendant,

VERLYNN JAMELAH HORNE,

did, knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises.

**D.    Manner and Means of the Scheme**

24.    It was part of the scheme to defraud that HORNE would and did submit and cause the submission of false and fraudulent applications for PPP and EIDL loans using interstate wires on behalf of entities in HORNE's control, including PEI, PSC, and GNTS, and support those applications with false and fraudulent supporting documentation in support of those loans to reflect employees and payroll that did not actually exist.

25.    It was further part of the scheme to defraud that the materially false, fraudulent, and misleading representations by HORNE in the PPP and EIDL loan applications and the false and fraudulent supporting documentation would and did cause the SBA and other lenders – including Fifth Third Bank – to approve the loans for the PEI, PSC, and GNTS and, via interstate wires, disburse funds to bank accounts for PEI, PSC, and GNTS controlled by HORNE.

26.    It was further part of the scheme to defraud that HORNE would and did falsely and fraudulently certify that the PPP funds acquired from the requested PPP loans by entities owned or controlled by HORNE would be used to retain workers, maintain payroll, or make mortgage interest payments, lease payments, and

utility payments, when in fact the PPP funds were used for the personal benefit of HORNE.

27.    It was further part of the scheme to defraud that HORNE would and did cause the COVID Fraud Clients to fraudulently apply for EIDL and PPP loans, using interstate wires, in exchange for the COVID Fraud Clients providing HORNE portions of the fraudulently obtained proceeds.

28.    It was further part of the scheme to defraud that HORNE would and did obtain personal identifying information (PII), as well as information about existing and newly-created businesses from the COVID Fraud Clients for the purpose of perpetrating this fraudulent scheme.

29.    It was further part of the scheme to defraud that HORNE would and did use the information obtained from the COVID Fraud Clients to apply for and obtain PPP and EIDL loans on behalf of the COVID Fraud Clients.

30.    It was further part of the scheme to defraud that HORNE would and did use the COVID Fraud Clients' information in EIDL and PPP applications to falsely report business revenues, payroll expenses, and employees on EIDL and PPP applications, when in fact, as HORNE then and there well knew, these revenues, payroll expenses, and employees did not exist.

31.    It was further part of the scheme to defraud that the materially false, fraudulent, and misleading representations included by HORNE in the EIDL and

PPP applications on behalf of the COVID Fraud Clients would and did cause the SBA and lenders to approve and disburse PPP and EIDL loans, using interstate wires, to bank accounts controlled by the COVID Fraud Clients.

32.    It was further part of the scheme to defraud that the COVID Fraud Clients would and did provide a portion of the loan proceeds received to HORNE as payment for HORNE's assistance.

33.    It was further part of the part of the scheme to defraud that HORNE would and did misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of acts performed in furtherance of the conspiracy.

**E.    Interstate Wires**

34.    On or about the dates set forth below, in the Middle District of Florida, and elsewhere, the defendant,

VERLYNN JAMELAH HORNE,

for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly, and with intent to defraud, transmit and cause to be transmitted by means of wire, radio, and television communication in interstate commerce, the following writings, signs, signals, pictures, and sounds:

| Count | Date | Interstate Wire | Resulting in: |
|---|---|---|---|
| ONE | 5/2/2020 | Submission of PPP loan application for PEI to Fifth Third Bank, processed using a server located outside of Florida | $43,000 disbursement to PEI bank account |
| TWO | 6/9/2020 | Submission of PPP loan application for Entity-1 to WebBank, processed using a server located outside of Florida | $96,650 disbursement to Entity-1 bank account, $34,000 of which was paid to HORNE via PSC |
| THREE | 6/23/2020 | Submission of PPP loan application for Entity-2 to Fifth Third Bank, processed using a server located outside of Florida | $164,582 disbursement to Entity-2 bank account, $80,061 of which was paid to HORNE via PSC |
| FOUR | 6/27/2020 | Submission of PPP loan application for Entity-3 to WebBank, processed using a server located outside of Florida | $155,207 disbursement to Entity-3 bank account, $68,687 of which was paid to HORNE via PSC |
| FIVE | 7/4/2020 | Submission of EIDL loan application on behalf of Person-2 to the SBA, processed using a server located outside of Florida | $81,500 disbursement to Entity-2 bank account, $32,175 of which was paid to HORNE via PSC |
| SIX | 7/23/2020 | Submission of PPP loan application for PSC to Fifth Third Bank, processed using a server located outside of Florida | $175,000 disbursement to PSC bank account |
| SEVEN | 8/3/2020 | Submission of PPP loan application for GNTS to Fifth Third Bank, processed using a server located outside of Florida | $162,915 disbursement to GNTS bank account |
| EIGHT | 4/17/2021 | Submission of PPP loan application for Entity-1 to WebBank, processed using a server located outside of Florida | $133,332 disbursement to Entity-1 bank account, $46,550 of which was paid to HORNE via GNTS |

| Count | Date | Interstate Wire | Resulting in: |
|-------|------|-----------------|---------------|
| NINE | 4/22/2021 | Submission of PPP loan application for Entity-2 to Fifth Third Bank, processed using a server located outside of Florida | $164,582 disbursement to Entity-2 bank account, $60,000 of which was paid to HORNE via PSC |

All in violation of 18 U.S.C. §§ 1343 and 2.

## COUNT TEN
### (Aggravated Identity Theft)

On or about July 23, 2020, in the Middle District of Florida, and elsewhere, the defendant,

### VERLYNN JAMELAH HORNE,

did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, specifically, E.L.'s name and Social Security number, during and in relation to a felony violation of 18 U.S.C. § 1343, as charged in this Indictment as Count Six, knowing that such means of identification belonged to an actual person.

In violation of 18 U.S.C. § 1028A(a)(1).

## COUNT ELEVEN
### (Transactional Money Laundering)

On or about September 9, 2020, in the Middle District of Florida, the defendant,

### VERLYNN JAMELAH HORNE,

12

did knowingly engage and attempt to engage in a monetary transaction by and
through and to a financial institution, affecting interstate and foreign commerce, in
criminally derived property of a value greater than $10,000, such property having
been derived from a specified unlawful activity, that is, the wire fraud alleged in
Counts One, Two, Three, Four, Five, Six, and Seven of this Indictment, by
purchasing a home at 1922 Black Lake Blvd., Winter Garden, Florida.

In violation of 18 U.S.C. § 1957.

### COUNTS TWELVE AND THIRTEEN
### (Willful Failure to File Tax Returns)

During the calendar years described below, in the Middle District of
Florida, and elsewhere, the defendant,

VERLYNN JAMELAH HORNE,

who was a resident of Orange County, Florida, had and received gross income at
least in the amounts shown below. By reason of such gross income, she was required
by law, following the closing of the calendar years below, and on or before the
dates shown below, to make an income tax return to a designated Internal
Revenue Service Center, to a person assigned to receive returns at the local office
of the Internal Revenue Service that serves Orange County, or to any other
Internal Revenue Service office permitted by the Commissioner of Internal
Revenue, stating specifically in such return the items of her gross income and
any deductions and credits to which he was entitled.  Well knowing and

13

believing all of the foregoing, the defendant did willfully fail, on or about the due dates shown below, in the Middle District of Florida, and elsewhere, to make an income tax return:

| Count | Calendar Year | Estimated Income Received | Due Date |
|---|---|---|---|
| 12 | 2020 | $1,955,031.75 | 5/17/2021 |
| 13 | 2021 | $298,212.00 | 4/18/2022 |

All in violation of 26 U.S.C. § 7203.

## FORFEITURE

1.    The allegations contained in Counts One through Nine and Eleven are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c).

2.    Upon conviction of wire fraud, in violation of 18 U.S.C. § 1343, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

3.    Upon conviction of a violation of 18 U.S.C. § 1957, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

4.    The property to be forfeited includes, but is not limited to, the following:

    a.  The real property titled in the name of HORNE and Terrance L. Horne located at 1922 Black Lake Blvd., Winter Garden, FL 34787; and

    b.  An order of forfeiture in the amount of at least $1,288,886, which represents the proceeds of the charged wire fraud scheme.

5.    If any of the property described above, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the

provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28

U.S.C. § 2461(c).

A TRUE BILL

Foreperson

GREGORY W. KEHOE
United States Attorney

By: _____
Dana E. Hill
Assistant United States Attorney

By: _____
Chauncey A. Bratt
Assistant United States Attorney
Deputy Chief, Orlando Division

FORM OBD-34
APR 1991

No.

## UNITED STATES DISTRICT COURT
Middle District of Florida
Orlando Division

## THE UNITED STATES OF AMERICA

vs.

## VERLYNN JAMELAH HORNE

## INDICTMENT

Violations: 18 U.S.C. § 1343
18 U.S.C. § 1028A
18 U.S.C. § 1957
26 U.S.C. § 7203

A true bill,

_____
Foreperson

Filed in open court this 4th day of June, 2025.

_____
Clerk

Bail    $_____

GPO 863 525